IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED

2009 FEB 25  A 11: 13

ROBIN REYNOLDS, individually and on
behalf of all others similarly situated,        )
                                                )
        *Plaintiffs,*                           )
                                                )
v.                                              )
                                                )
COLONIAL BANCGROUP, INC.; ROBERT                )
E. LOWDER; SARAH H. MOORE; T.                   )
BRENT HICKS; and PATTI HILL                     )

        *Defendants.*

CIVIL ACTION NO. ??A P. HACKETT, CLK

CLASS ACTION COMPLAINT

2:09 CV148 — MHT

**JURY TRIAL DEMANDED**

## CLASS ACTION COMPLAINT FOR
## VIOLATIONS OF FEDERAL SECURITIES LAWS

The Plaintiff Robin Reynolds alleges the following based upon the investigation of the Plaintiff's counsel, which included a review of United States Securities and Exchange Commission (SEC) filings by Colonial BancGroup, Inc. ("Colonial" or the "Company"), as well as regulatory filings and reports, press releases and other public statements issued by the Company, and media reports about the Company. The Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein against Colonial and the Individual Defendants, after a reasonable opportunity for discovery.

### INTRODUCTION

1.     This securities class action is filed against Colonial BancGroup, Inc. (NYSE Ticker Symbol: CNB) on behalf of all individuals who purchased or otherwise acquired the publicly traded securities of Colonial between January 23, 2008 and January 27, 2009, inclusive (the "Class Period"), for violations of the Securities Exchange Act of 1934 (the "Exchange Act"). As set forth below, Defendants knowingly or recklessly made a series of material misrepresentations concerning the Company's participation in the Troubled Asset Relief Program (TARP) during the Class Period.

2.     Colonial is incorporated under the laws of Delaware, but its main office is located in Montgomery, Alabama.

3.     During the Class Period, the Defendants issued materially misleading statements regarding the Company's business, financial results and prospects. Because of those materially false and misleading statements, Colonial's stock traded at artificially inflated prices during the Class Period, reaching a high of $16.06 per share in February 2008.

4.     As the real estate market began to collapse in 2008, Colonial began facing financial difficulties based largely on its real estate loan assets. In a press release issued in connection with its third quarter results, Colonial announced a net loss of $71.2 million and a suspension of dividends, sending shares of Colonial to a low of $1.44.  Less than a month after its third quarter press release, Colonial announced that it had applied for participation in TARP, and shares rallied from $1.76 to $2.66.

5.     After shares dropped slightly with no new information about Colonial's TARP application, on December 2, 2008, Colonial issued a press release "in order to correct what it perceives to be misinformation in the market place," which stated that Colonial had received preliminary approval for $550 million in TARP funds.  Colonial did not include in its press release that receipt of the TARP funds was conditioned on Colonial raising an additional $300 million in private equity, a fact known to both Colonial and the Individual Defendants.  On the basis of Colonial's press release (and omission of the condition precedent), Colonial shares rose 54%, from $2 to $3.08, on December 2, 2008.

6.     Colonial did not disclose the $300 million condition precedent until after the market closed on January 27, 2009, issuing a press release admitting that receipt of the TARP funds had always been conditioned on Colonial's ability to raise the private equity funding.  On January 28, the day following Colonial's admission, share prices plunged more than 50 percent, from $1.58 to $0.63.

## JURISDICTION AND VENUE

7.     The claims asserted in this complaint arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. sections 78j(b) and 78(t)(a), and Rule 10b-5, 17 C.F.R. section 240, promulgated under those sections by the SEC.

8.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C.

section 1331 and Section 27 of the Exchange Act, 15 U.S.C. section 78a.

9.     Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. section 1391(b), because Colonial's principal place of business is in Montgomery, Alabama, and many of the acts complained of occurred in this District.

10.     In connection with the acts alleged in this complaint, the Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

11.     The Plaintiff, Robin Reynolds, as set forth in the Certification filed with this Complaint and incorporated by reference, purchased Colonial common stock at artificially inflated prices during the Class Period and has been damaged by the acts described here.

12.     Defendant Colonial is a Delaware corporation, with its principal executive offices located in Montgomery, Alabama.

13.     Defendant Robert E. Lowder was, at all material times, the Company's President and Chief Executive Officer, as well as a Director on the Company's Board of Directors.

14.     Defendant Sarah H. Moore was, at all material times, the Company's Chief Financial Officer.

15.     Defendant T. Brent Hicks was, at all material times, the Company's Chief Accounting Officer.

16.     Defendant Patti Hill was, at all material times, the Company's Chief Operating Officer and a Senior Executive Vice President.

17.     Collectively, Lowder, Moore, Hicks, and Hill are referred to as "the Individual Defendants."

18.     Because of the Individual Defendants' positions and responsibilities with the

Company, they were privy to the adverse undisclosed information about the terms under which the United States Treasury was willing to provide $550 million in TARP funds to the Company, because the Individual Defendants received drafts of those terms, participated in discussions with the Treasury; attended meetings of management and/or Board of Directors and committees thereof; and received corporate reports and other information provided to them. Because of their possession of that vital information, the Individual Defendants knew or recklessly disregarded that the adverse facts in this Complaint had not been disclosed to–and were being concealed from–the investing public.

19.     Defendant Lowder, as alleged more fully below, actually made false and misleading statements in the Press Release the Company issued on December 2, 2008 on which this action is based in substantial part. In addition, Defendant Hicks signed the Form 8-K filed with the SEC on December 2, 2008, which is also alleged to have been materially false and misleading, and to which the December 2 Press Release was attached.

20.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's December 2, 2008 public statements are the collective actions of this narrowly defined group of officers of the Company identified above. Each of the above Colonial officers, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to the negotiations with the Treasury concerning all of the terms under which $550 million in TARP-related capital would be provided to the Company. The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information described here, were aware (or recklessly disregarded) that the false and misleading statements were being issued regarding the terms of the cash infusion, and approved or ratified these statements in violation of the Federal securities laws. Accordingly, each of the Individual Defendants is primarily liable for the misrepresentations alleged in this Complaint.

21.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC under the Exchange Act, and is (and has been at all

relevant times) traded on the New York Stock Exchange (NYSE), and governed by the provisions of the Federal securities laws, the Individual Defendants each had a duty to disseminate promptly accurate, complete, and truthful information regarding the terms with which the Company would have to comply to receive TARP funds, so that the price of the Company's publicly-traded securities would be based upon truthful and accurate information. The misrepresentations and omissions during the Class Period alleged in this Complaint violated these specific requirements and obligations.

22.     As a result, each of the Individual Defendants may be held liable as direct participants in the wrongs complained of in this Complaint.

## CLASS ACTION ALLEGATIONS

23.     The Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased the publicly-traded securities of Colonial during the period from January 23, 2008 through January 27, 2009, inclusive and who were damaged thereby (the "Class"). Excluded from the Class are the Defendants; the officers and directors of the Company at all relevant times; members of their immediate families and their legal representatives, heirs, successors or assigns; and any entity in which the Defendants have or had a controlling interest.

24.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Colonial shares were actively traded on the NYSE. While the exact number of Class members presently is unknown to the Plaintiff and can only be determined through appropriate discovery, the Plaintiff believes that there are hundreds–or thousands–of Class members.  Members of the Class may be identified from records maintained by Colonial or its transfer agent, and Class members may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

25.     The Plaintiff's claims are typical of the claims of the members of the Class, because all members of the Class have been adversely impacted by the Defendants' wrongful conduct in violation of Federal securities laws in a similar fashion.

26.     The Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.

27.     Common questions of law and fact regarding all members of the Class exist and those common questions predominate over any questions solely affecting individual members of the Class.  Among the common questions of law and fact are the following:

        a.     whether the Defendants violated the federal securities laws as alleged here;

        b.     whether statements made by the Defendants to the investing public during the Class Period misrepresented material facts regarding the terms under which the Treasury would provide a $550 million infusion of TARP capital to the Company;

        c.     whether the Defendants acted knowingly or recklessly; and

        d.     to what extent the members of the Class have sustained damages and the proper measure of damages.

28.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, because joinder of all Class members is impracticable.  Also, because the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  This case, like other securities cases is easily maintained as a class action.

### SUBSTANTIVE ALLEGATIONS AND THE DEFENDANTS' MISLEADING STATEMENTS

*Colonial Bank's Financial Difficulties in the Year 2008*

29.     With the collapse of the housing market in recent years, financial institutions have undergone significant hardship.  Many regional banks have failed or been bought out by their larger counterparts. Financial institutions, especially those with significant exposure to loans made in the commercial and residential real estate markets, have been forced to write down the

value of loan portfolios, collateralized debt obligations, and mortgage backed securities on their balance sheets. Colonial Bank is no exception, and its 2008 financial picture reflects the overall downward trend seen in the industry. Colonial's loan portfolio contains significant numbers of loans in the Florida and Nevada real estate markets.  Given the rapid decline in real estate prices in these markets, Colonial's loans secured by those assets have come under intense pressure and, because of default or otherwise, Colonial in many circumstances has been forced to write down or write off the value of these stressed loan assets.

30.    On January 23, 2008, Colonial announced its full year and fourth quarter 2007 financial results, in a release which stated in part:

The Colonial BancGroup, Inc. Chairman, CEO and President, Robert E. Lowder, announced today that the Company had operating earnings per diluted share for the year ended December 31, 2007 of $1.37, compared to $1.71 in 2006. Net income per diluted share for the year ended December 31, 2007 was $1.17 compared to $1.72 in 2006.

Net income per diluted share in the fourth quarter of 2007 was $0.06 compared to $0.43 per share in the fourth quarter of 2006. The Company recognized $0.02 of merger and severance expenses in the fourth quarter, bringing operating earnings per diluted share to $0.08.

***"In light of current economic conditions and after undertaking a comprehensive review of our asset portfolio in every market, Colonial has conservatively provided $93 million in the quarter to build our loan loss reserves to 1.50% of loans. We believe that by increasing our loan loss reserves to that level, and providing 2.7 times more than our net charge-offs in the quarter, Colonial is well positioned to handle the continued weakness in the housing sector," said Mr. Lowder.*** The allowance for loan losses was $239 million, or 1.50% of loans, at December 31, 2007, up from $175 million, or 1.13% of loans, at December 31, 2006. The allowance represented 174% of nonperforming assets at December 31, 2007.

Colonial's net charge-offs were 0.35% of average loans for 2007, an increase from 0.12% for 2006. Colonial recorded net charge-offs in the fourth quarter of $34 million, or 0.88% annualized of average loans in the quarter compared to annualized net charge-offs of 0.18% of average loans for the first nine months of the year. The nonperforming assets ratio at December 31, 2007 was 0.86% of period end loans and nonperforming assets compared to 0.46% at September 30, 2007 and 0.16% at December 31, 2006. Total nonperforming assets at December 31, 2007 were $138 million. As expected, nonperforming assets primarily consisted of residential real estate loans in Florida.

Total loans were $15.9 billion at December 31, 2007 compared to $15.5 billion at December 31, 2006, a 3% increase. Excluding the two acquisitions completed in 2007 and the sale of residential real estate loans early in 2007, loans at December 31, 2007 declined by 1% from December 31, 2006. *"We began to see signs of overbuilding and excess inventories in 2006, mainly in markets and in property types with large speculative components. As a result, we tightened our underwriting standards considerably and therefore generated little new loan volume outside of the State of Texas, which so far remains a bright spot in the country,"* said Mr. Lowder.

\* \* \*

"The daily reports of worsening economic conditions in the U.S., especially in the financial services sector, warrant comment. *Fortunately, Colonial has no subprime exposure and stopped lending in the riskiest condo-building areas well before these sweeping developments.* Nonetheless, the illiquidity in the financial markets affects some of Colonial's borrowers markedly. *Our special assets teams – which have seen and coped with these market cycles before – are working effectively to minimize the bank's exposure. I expect 2008 to bring further challenges to the industry, but with our solid capital and market places which are inherently attractive, Colonial is confident, that in the words of the old saying 'this too will pass'.* Acting upon this belief, the Company approved a modest increase in the dividend at our most recent board meeting," said Mr. Lowder.

31.    On this positive news, Colonial's stock closed up $1.49 per share to close at $13.39 per share on January 23, 2008. Thereafter the shares began to climb, hitting their Class Period high of $16.06 per share on February 1, 2008.

32.    On February 25, 2008, Colonial filed its Form 10-K for year-end 2007, which included the fourth quarter and year-end 2007 results. The Form 10-K included substantially the same financial results as reported in the January 23, 2008 press release. The Form 10-K further reflected Colonial's goodwill balance for the year ending December 31, 2007 as $1.0 billion, reporting that its goodwill was not impaired.

33.    On or about April 18, 2008, Colonial filed with the SEC a Form S-3ASR Registration Statement and Prospectus using a "shelf" registration or continuous offering process. Under the shelf, Colonial would be permitted to sell securities described in the Prospectus in one or more offerings, including additional shares of Colonial's common stock. The Prospectus was a part of the Registration Statement. The securities were to be issued by Colonial. The Registration Statement incorporated by reference Colonial's previously filed

Form 10-Ks, Form 10-Qs and Form 8-Ks.

34.     The Form S-3ASR incorporated by reference subsequently filed prospectuses:

That, for the purpose of determining any liability under the Securities Act of 1933, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

35.     The Form S-3ASR also included assurances that the registrant would "reflect in the prospectus any facts or events arising after the effective date of the registration statement . . . which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement."

36.     On April 21, 2008, Colonial issued its first quarter 2008 financial results, in a release which spoke of the Company's performance in very positive terms:

The Colonial BancGroup, Inc. Chairman, CEO and President, Robert E. Lowder, announced today that the Company's earnings for the quarter ended March 31, 2008 were $0.16 per diluted share. "I am happy to report that we earned $0.16 per share in the first quarter despite the challenging operating environment for all financial institutions. *Our continued profitability is evidence of our ability to deal with a difficult credit environment while continuing to focus on our core business.* Over the years, Colonial has weathered many credit cycles. The experience we have gained as we navigated through market downturns has prepared us for the current issues that we face as a Company. As we have stated many times, while Colonial is not immune to the current economic conditions and we expect adverse conditions to continue through the remainder of 2008, *we believe that we have identified the problems and those problems are centered in our residential real estate construction portfolio.* We are pleased to report that, to date, we have not seen significant declining credit quality trends in the commercial real estate, consumer or C&I portfolios," said Mr. Lowder.

Colonial also announced today that it will issue common equity in a public offering and will reduce its dividend in order to fortify its balance sheet in this unprecedented period of industry-wide credit losses. *Though the Company would remain well-capitalized independent of the offering, the issuance is a proactive and prudent step to allow it to continue its aggressive loan work out efforts while maintaining healthy capital ratios.* In addition, illiquid capital markets have resulted in temporary mark-to-market adjustments on Colonial's highly-rated investment securities portfolio which do not reflect the portfolio's underlying performance but negatively impact tangible common equity.

*"A lesson learned from our prior experiences in times similar to these is the importance of being proactive in a challenging environment. During the first quarter, Colonial issued $250 million of subordinated debt which qualifies as regulatory capital. The common stock offering will provide more capital than would be required to remain well-capitalized even under very severe credit scenarios,"* said Mr. Lowder. "Finally, the offering positions us well to create long-term shareholder value when the environment improves."

The reduction of Colonial's dividend is part of Colonial's capital management plan. The dividend reduction will preserve upwards of $60 million of capital annually. "Our decision to reduce our common dividend was not taken lightly. However, we concluded it was the right long-term decision for shareholders because the persistent uncertainties of the current environment demand that we proceed cautiously with respect to capital," said Mr. Lowder.

Colonial's net charge-offs were $33.6 million, or 0.84% annualized of average loans, for the first quarter of 2008, down from 0.88% annualized for the fourth quarter of 2007. The nonperforming assets ratio at March 31, 2008 was 1.65% of period-end loans compared to 0.86% at December 31, 2007, reflecting both the continued deterioration in the Company's residential real estate construction portfolio and the Company's decision to work out many of its nonperforming loans rather than sell them at a deep discount to their intrinsic value. Colonial's loan loss provision of $35.5 million exceeded net charge-offs by $2 million, increasing the loan loss reserve to $241 million. The loan loss reserve at March 31, 2008 was 1.50% of period-end loans.

Total loans were $16.1 billion at March 31, 2008 compared to $15.9 billion at December 31, 2007. Construction loans declined by $117 million, or 7% annualized, which was offset by an increase in mortgage warehouse loans.

*"We have taken steps to strengthen Colonial's position. We have systematically identified and isolated problematic credits, created a bankwide loan monitoring process that ends with me, and dedicated highly experienced, skilled people to the task of resolving individual credit situations. We've further strengthened our underwriting criteria to include lower loan to value ratios on residential property types, tightened credit criteria for consumer loan products and implemented increased risk based pricing across all lending lines."*

"While we are concentrating on the things that deserve extra care and attention right now, we continue to find that, even in the discouraging times, there are opportunities. So, as demand for loans has diminished, we have focused our loan officers on growing low cost deposits by partnering with the retail branch employees to call on commercial customers. This campaign has been successful as indicated in our deposit growth statistics in the first quarter. Growth in deposits has helped to improve our already strong liquidity position," said Mr. Lowder.

\* \* \*

> *"If there is a silver lining in this credit cycle, it is that Colonial is prepared to tackle the tough times because of the decisions we made in the good times.* With the help of the market insight provided by our local management and boards of directors, we detected signs of overbuilding in certain parts of Florida in 2006. Earlier, we saw the signs of potential weakness in the Miami condominium market. In response, we pulled back on new residential development lending and implemented a moratorium on new high rise condominium development loans. *These forward thinking strategies are what Colonial has relied upon and will continue to utilize in order to maintain our position of strength and stability in uncertain times,"* concluded Mr. Lowder.

37.    On or about April 23, 2008, Colonial filed its Prospectus for the Offering, which forms part of the Registration Statement and which became effective on April 21, 2008. At least 43.7 million shares of Colonial common stock were sold to the public at $8.00 per share in the Offering, raising $350 million (which included an additional 5.7 million shares of common stock which were granted to the underwriters under a 30-day option to cover over-allotments).

38.    The Prospectus included the following about Colonial's financial results:

**Recent Financial Results**

On April 21, 2008, we announced financial results for the quarter ended March 31, 2008. Despite the challenging operating environment for all financial institutions, we reported net income of $25 million for the first quarter of 2008 compared to net income of $9 million for the fourth quarter of 2007 and $36 million for the first quarter of 2007. Our diluted earnings per share of $0.16 for the first quarter represent an increase of $0.10 over the fourth quarter of 2007 and a decrease of $0.08 from the first quarter of 2007. The first quarter's per share results include a $0.02 reduction for the correction of inadvertent errors discovered in the first quarter which were not material, individually or in the aggregate, to any previous periods and are not expected to be material to our expected results of operations, financial position or cash flows for 2008. These errors related principally to the accounting for the carrying value of certain loans held for sale and the associated derivatives. The increases in net income and net income per share versus the fourth quarter of the prior year were due to a decrease in provision for loan losses which was offset partially by decreases in net interest income and noninterest income and an increase in noninterest expense. The decreases in net income and net income per share versus the first quarter of the prior year were due to higher credit costs, as increases in noninterest income and noninterest expense substantially offset each other. These factors may continue to affect adversely our results through the remainder of 2008.

Net charge-offs were $33.6 million, or 0.84% annualized of average loans, for the first quarter of 2008, down from 0.88% annualized for the fourth quarter of

2007. The nonperforming assets ratio at March 31, 2008 was 1.65% of period-end loans compared to 0.86% at December 31, 2007, reflecting both the continued deterioration in our residential real estate construction portfolio and our decision to work out many of our nonperforming loans rather than sell them at a deep discount to their intrinsic value. *As a result of our work out strategy, nonperforming assets may continue to rise through the second quarter of 2008. We also expect net charge-offs to rise above the first quarter level in the second quarter of 2008. We expect net charge-offs to decline in the last two quarters of 2008 resulting in a net charge-off ratio for the full year of 2008, approximating the annualized ratio for the first quarter of 2008.* Our loan loss provision of $35.5 million for the first quarter of 2008 exceeded net charge-offs by $2 million, increasing the loan loss reserve to $241 million, or 1.50%, of period-end loans at March 31, 2008.

Total assets were $27 billion, of which total loans comprised $16.1 billion at March 31, 2008 compared to $15.9 billion at December 31, 2007. Total deposits were $19 billion at March 31, 2008 and average deposits for the first quarter of 2008 increased 38% annualized from the fourth quarter of 2007 and 17% from the first quarter of 2007.

\* \* \*

On March 6, 2008 we issued $250 million of 8.875% Subordinated Notes due 2038. On April 21, 2008 we announced a quarterly dividend of $0.095 per share. Our Board of Directors will determine future dividend rates based on the results of operations and estimates of performance going forward.

39.     The Prospectus omitted important information about Colonial's exposure to the real estate markets and how the changes in the market were affecting Colonial by the time of the Offering, including omitting information about how this exposure could affect the Company's capital base.

40.     The Registration Statement/Prospectus contained untrue statements of material fact or omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with applicable SEC rules and regulations.

41.     The statements above were false and/or misleading because the dislocation in the financial markets was then having an increasingly severe impact on Colonial's business, which significantly increased the risk level of the Offering.

42.     On May 5, 2008, Colonial filed its Form 10-Q for the first quarter of 2008, which included substantially the same financial results previously reported on April 21, 2008. The

Form 10-Q further reflected Colonial's goodwill balance for the quarter ending March 31, 2008 as $1.0 billion, reporting that its goodwill was not impaired.

43.     As the economy soured, Colonial finally acknowledged some financial difficulties. In a press release accompanying its first quarter 2008 results, Colonial announced that it would reduce dividends and issue more than $300 million of common stock to fortify its balance sheet during difficult economic times, but Mr. Lowder maintained his optimism:

> I am happy to report that we earned $0.16 per share in the first quarter despite the challenging operating environment for all financial institutions. Our continued profitability is evidence of our ability to deal with a difficult credit environment while continuing to focus on our core business. Over the years, Colonial has weathered many credit cycles. The experience we have gained as we navigated through market downturns has prepared us for the current issues that we face as a Company. As we have stated many times, while Colonial is not immune to the current economic conditions and we expect adverse conditions to continue through the remainder of 2008, we believe that we have identified the problems and those problems are centered in our residential real estate construction portfolio. We are pleased to report that, to date, we have not seen significant declining credit quality trends in the commercial real estate, consumer or C&I portfolios

44.     On April 21, 2008, the same day that Colonial released its first quarter results and Lowder made his statements claiming no decline in credit quality trends for Colonial's portfolios, international credit rating agency Fitch Ratings issued a statement confirming its Negative Rating Outlook for Colonial BancGroup and its subsidiaries:

> [T]he Negative Outlook remains, as concerns still exist with regard to CNB's credit quality and its significant exposure to troubled markets such as Florida. During 1Q08, asset quality deterioration continued, mainly in its residential real estate construction portfolio, causing NPA's to increase to 1.65% at March 31, 2008 from 0.86% at Dec. 31, 2007. While further credit stress is expected, should asset quality deteriorate beyond manageable levels, such that the company's earnings and capital position continue to be materially impacted by credit losses, Fitch would likely downgrade CNB's ratings. Conversely, Fitch could revise the Rating Outlook to Stable, provided that credit quality stabilizes over the coming periods.

45.     On July 16, 2008, Colonial reported its second quarter 2008 financial results, in a release which stated in part:

The Colonial BancGroup, Inc. Chairman, CEO and President, Robert E.

13

Lowder, announced today that the Company's net loss for the quarter ended June 30, 2008 was $9 million, or $0.05 per diluted share. "The economic downturn that began to impact Colonial's customers during 2007 has, as we expected, continued into 2008. As I have publicly stated on a number of occasions, we expected second quarter results to demonstrate an increase in charge-offs and problem assets because Colonial's markets, which are located in some of the country's fastest growth areas, have unfortunately been disproportionately affected by the housing downturn. As such, we are feeling the effects of the current economy. These results, while disappointing, were not unexpected," said Mr. Lowder.

Colonial raised $333 million, net, in common equity in a public offering during the second quarter through the issuance of 43.7 million shares of common stock. The issuance was a proactive and prudent step to allow aggressive loan work out efforts while maintaining strong capital ratios. The key regulatory ratios at June 30, 2008, were Tier 1 Capital of 10.10%, Total Capital of 14.13% and Leverage Ratio of 7.38%, all of which are above the "well capitalized" regulatory minimums of 6%, 10% and 5%, respectively. *"At these levels, Colonial has significant amounts of excess capital which, coupled with our reserves, will allow us to remain strong during this period of economic uncertainty. We also continue to produce significant operating earnings each quarter that are available to absorb credit costs. Colonial is on solid footing, and we do not expect to raise additional capital,"* said Mr. Lowder.

*"We believe that our experienced lending, credit and special assets teams have identified our credit problems, which for Colonial continue to be isolated in residential related construction property types.* We are working diligently to resolve issues on a case by case basis. We are pleased to report that loans past due 30-89 days at June 30, 2008 were down 40% from March 31, 2008. Loans past due more than 90 days but still accruing interest decreased 56% from March 31, 2008 to $31.3 million, or 0.20% of total loans, at June 30, 2008," said Mr. Lowder. Colonial's net charge-offs were $73 million, or 1.85% of average loans, annualized, for the second quarter of 2008, compared to 0.84% annualized for the first quarter of 2008. The nonperforming assets ratio at June 30, 2008 was 2.62% compared to 1.65% at March 31, 2008, reflecting a $94 million increase in foreclosed assets, as the Company continues its aggressive collection efforts. Colonial strengthened the loan loss reserve during the second quarter to $247 million, or 1.60% of period end loans, compared to 1.50% of period end loans at March 31, 2008.

Total loans were $15.5 billion at June 30, 2008, a decrease from $16.1 billion at March 31, 2008. Construction loans declined by $395 million, or 26% annualized, from March 31, 2008 to June 30, 2008. Approximately $239 million of the decrease in construction loans from March 31, 2008 was in Florida and Georgia which are among the markets that have experienced the most stress.

*"Colonial is in a strong liquidity position.* The retail franchise provides the most important source of funding to the Company as it funds 70% of total

assets. Average deposits for the second quarter of 2008 grew 15% over the second quarter of 2007 and 5% annualized over the first quarter of 2008. In addition to the Company's strong retail franchise, estimated wholesale funding available to the Company from a variety of sources is over $5 billion at June 30, 2008," said Mr. Lowder.

\* \* \*

"In the perfect storm environment that has severely impacted the residential construction industry throughout Colonial's footprint, we believe that healthy capital, liquidity and reserves will provide stability and soundness in a time of uncertainty and weakness. Colonial is positioned well in all of these critical areas to endure the current credit cycle," concluded Mr. Lowder.

46. On August 5, 2008, Colonial filed its Form 10-Q for the second quarter 2008, which included substantially the same financial results reported on July 16, 2008. The Form 10-Q further reflected Colonial's goodwill balance for the quarter ending June 30, 2008 as $1.0 billion, reporting that its goodwill was not impaired.

47. On July 16, 2008, Colonial Bank reported its second quarter results. The report detailed that Colonial Bank had suffered a net loss of $0.05 per share and reduced assets by $1.3 billion, but the press release, including Mr. Lowder's accompanying statements, remained mixed:

Colonial raised $333 million, net, in common equity in a public offering during the second quarter through the issuance of 43.7 million shares of common stock. The issuance was a proactive and prudent step to allow aggressive loan work out efforts while maintaining strong capital ratios. The key regulatory ratios at June 30, 2008, were Tier 1 Capital of 10.10%, Total Capital of 14.13% and Leverage Ratio of 7.38%, all of which are above the "well capitalized" regulatory minimums of 6%, 10% and 5%, respectively. "At these levels, Colonial has significant amounts of excess capital which, coupled with our reserves, will allow us to remain strong during this period of economic uncertainty. We also continue to produce significant operating earnings each quarter that are available to absorb credit costs. Colonial is on solid footing, and we do not expect to raise additional capital," said Mr. Lowder.... "In the perfect storm that has severely impacted the residential construction industry throughout Colonial's footprint, we believe that healthy capital, liquidity and reserves will provide stability and soundness in a time of uncertainty and weakness. Colonial is positioned well in all of these critical areas to endure the current credit cycle," concluded Mr. Lowder.

48. In the third quarter of 2008, the financial news concerning Colonial Bank began to sound more ominous. On September 9, 2008, an Associated Press article reported that,

"Colonial BancCorp, Inc. shares tumbled Tuesday after an analyst downgraded the shares to 'sell,' noting continued credit deterioration and the company's significant exposure to the housing market. Shares dropped 57 cents, or 7.1 percent.  In a note to clients Tuesday, Sterne Agee analyst Adam Barkstrom cut his rating on the shares to 'Sell' from 'Hold.'"

49.     On October 22, 2008, Colonial Bank released its third quarter financial results. While Lowder made statements asserting that "we are confident in the ability of our institution to weather the financial headwinds," Colonial reported a loss of $0.35 per share in the quarter and suspended quarterly dividends. The net loss of approximately $71.2 million stood in stark contrast to the net income of $69.4 million reported for the third quarter of 2007, and the suspension of dividends was a cause of concern for both shareholders and analysts.

50.     The third quarter report sent shares into a steep decline, and many analysts expressed concern with the direction of Colonial.  A Reuters article the day after the third quarter results were released noted, "Shares of Colonial BancGroup, Inc. plunged as much as 54 percent Thursday, a day after the financial services company reported a huge loss and suspended its quarterly dividend.  Several analysts expressed concerns about the company's future profitability and provision for bad loans." On October 28, Business Wire reported that "Fitch Ratings has downgraded The Colonial BancGroup Inc's (CNB) long- and short-term Issuer Default ratings (IDR) … reflecting continued asset quality deterioration and the impact of heightened credit losses on CNB's earnings."  The third quarter loses coupled with the drastic reduction in stock price brought Colonial to the brink of financial ruin as it neared the end of 2008.

### *Colonial Applies to Participate in the TARP Capital Purchase Program*

51.     On October 3, 2008, Congress passed, and President Bush signed into law, the Emergency Economic Stabilization Act of 2008. The Act authorized the Treasury and the Federal Deposit Insurance Corporation (FDIC) to create and implement the Troubled Assets Relief Program (TARP).  TARP was designed to assist financial institutions, such as Colonial, in either (1) offloading troubled real-estate backed loans or (2) infusing those institutions with new capital in exchange for a combination of warrants and preferred and/or common stock in participating institutions.  TARP was designed to shore up the balance sheets of the institutions.

52.     Financial institutions were required to apply for TARP funds through its Federal regulator, and the Treasury could deny, approve, or conditionally approve asset purchases based on several factors that assess the institution's overall financial health.

53.     After the passage of TARP, financial institutions–including Colonial–began discussions with their regulators, the Treasury, and the FDIC concerning the availability of TARP funds, including the terms and conditions on which the Treasury and/or FDIC would insist for a financial institution to receive TARP funds.  The specifics of Colonial's negotiations with the Treasury and FDIC were not publicly discussed.

54.     In the weeks after TARP was created, concerns about Colonial Bank's eligibility for the program caused its stock to drop.

55.     On November 13, 2008, Colonial issued a press release "to correct what it perceives to be misinformation in the marketplace."  The release stated that Colonial had applied for participation in the TARP program.  Although Colonial did not predict the outcome of its application, it stated that the "application was delivered to the FDIC in a timely manner... Colonial has been given no information that would lead it to doubt that its application is not being processed through the normal channels."

56.     In fact, as reported much later in a WallStreetJournal.com article, Colonial Bank's application for TARP funds was not "being processed through the normal channels:"

> In Alabama, Colonial BancGroup Inc. asked for Treasury cash in November. With its application blessed by its state regulator and the Federal Deposit Insurance Corp., the Montgomery bank figured it was a shoo-in for funds, say people familiar with the bank.

> But because Colonial was weighed down by real-estate loans, the Treasury sent the bid to its panel for reviewing controversial applications, consisting of four federal regulatory bodies: the FDIC, the Fed, the OCC and the Office of Thrift Supervision.  Negotiations lasted several weeks.

57.     The approval for participation in the TARP program was widely considered essential to the continued viability of the Company, a fact that was reflected in Colonial's stock price, which dropped precipitously on fears that the Company would not qualify for TARP, but rallied after Colonial's November 13 press release.  In a <u>Time.com</u> article released after

Colonial's press release, Stephen Gandel stated the following regarding Colonial's situation:

> "If a bank has not received TARP funds, it means one of two things," says Michael Levine, a portfolio manager at OppenheimerFunds. "Either you are strong enough that you don't need the funds, or, two, you are screwed." ... Shares of Colonial had fallen as low as $1.44, plunging 46% in a week, on fears the firm wouldn't qualify for government assistance. On Thursday, though, the firm said it had applied to receive TARP funds. The company's shares rallied on the news to a recent $1.98.

58. A day later analyst Jaime Peters echoed those statements:

> We are increasing our uncertainty rating on Colonial BancGroup to extreme as we wait for the bank to announce whether it received approval from the government to participate in the Capital Purchase Program. We believe Colonial needs these funds to shore up customer confidence and help absorb the loan losses on its books. If the bank does not receive approval, we would immediately worry about the message the government is sending shareholders about the viability of the bank.

59. From November 12 to November 13, Colonial's share price for common stock went from $1.76 to $2.66 based on its press release stating that it had applied for TARP relief.

### Colonial Indicates Approval for TARP Participation

60. On December 2, 2008, Colonial Bank issued a press release stating that it had received preliminary approval for $550 million in TARP-related capital. While the title of the release mentions "preliminary" approval, many of the statements in the actual release indicated that the capital infusion was done, and no discussion of any specific terms or conditions of final approval were included:

> The Colonial BancGroup, Inc. today announced that it has received preliminary approval to participate in the United States Treasury Department's capital purchase program. ***Colonial BancGroup will receive $550 million from the Emergency Economic Stabilization Act of 2008*** aimed at enhancing the economy by restoring liquidity and increasing financing to businesses and consumers. The preliminary approval is subject to certain conditions and the execution of definitive agreements.
>
> In exchange for its investment, the Treasury will receive shares of Colonial BancGroup preferred stock which will pay a 5% dividend for the first five years. If the shares are not redeemed by Colonial within five years, Colonial will pay the

government dividends at a 9% annual rate. The U.S. Treasury will also receive warrants to purchase shares of Colonial BancGroup common stock for 10 years.

"We fully support and applaud the actions by the U.S. Treasury Department to support stability, safety and soundness of the nation's financial institutions," said Colonial BancGroup Chairman, CEO and President Robert E. Lowder. *"The $550 million in new capital will enhance our capital cushion and will allow Colonial Bank to meet our customers' financing needs with additional lending activity throughout our five state footprint."*

61.     In a form 8-K filed with the SEC in connection with the December 2 press release, Colonial described the release simply as "Press Release Announcing BankGroup's Approval and Participation in the US Treasury's Purchase Program Dated December 2, 2008." The Form 8-K stated as follows:

On December 2, 2008, the Colonial Bancgroup, Inc. (BancGroup) announced that it received preliminary approval from the U.S. Treasury Department to participate in its capital purchase program and receive $550 million under the Emergency Economic Stabilization Act of 2008.

62.     In no statements did Colonial discuss any specific conditions or impediments to receiving the TARP funds, including the condition precedent of raising $300 million in private capital–a fact that the Defendants knew and concealed.

63.     These public statements on December 2, 2008 were an intentional misrepresentation of the true facts regarding Colonial's receipt of TARP funding from Treasury and the FDIC. In truth, Treasury and the FDIC insisted that Colonial would be required to raise additional outside capital of $300 million as a condition precedent to Colonial's receiving the $550 million in TARP funding.  The requirement to raise $300 million in outside capital was never disclosed by the Defendants until after the markets closed on January 27, 2009.  Before then, the market and purchasers of publicly traded Colonial securities relied on the information Colonial disseminated, that TARP funding had been approved, subject only to the conditions described in the December 2, 2008 Press Release. The requirement to raise an additional $300 million in private equity was a material condition precedent to TARP approval, given the difficulties facing all financial institutions in raising capital and as evidenced by the precipitous fall in Colonial's share price on January 28, 2009–after it disclosed the true facts on January 27,

2009.

***Reactions to Colonial's Statements***

64.     The December 2nd press release, and Lowder's discussions of it, were unequivocal indications that TARP approval for Colonial was a merely formality and Colonial Bank's stock price reacted accordingly.

65.     On December 2, 2008, the *Birmingham Business Journal* ran an article titled simply "Colonial Bank to take $550M in fed funds," in which the author, based on the press release, stated "Colonial BancGroup will receive a $550 million capital infusion from the government." Similarly, the next day the *Mobile Press-Register* ran an article titled "Colonial BankGroup gets $550M in bailout," and the *Tampa Bay Business Journal* published one titled "Colonial gets $550 million in TARP funds." Analyst Jamie Peters posted an entry in her blog stating simply "Colonial Gets TARP Approval."

66.     In reaction to Colonial's press release and the media response to it, Colonial's shares jumped 54 percent in a day, from $2.00 to $3.08.

67.     When some began to question the validity of Colonial Bank's statement and its continuing capital problems, Colonial Bank remained silent. In a December 5th article titled "Tarp Funds Aside, Capital Remains Issue at Colonial," Katie Kuehner-Herbert noted as follows:

> Colonial BancGroup Inc. defied some expectations this week when it said it had secured preliminary approval for funds from the federal bailout program.
>
> Still, analysts question whether the capital is enough to ensure independence for the Montgomery, Ala., company, which is dealing with mounting credit deterioration in its home builder portfolio. Also this week, Colonial parted company with its chief credit officer, though it would not provide a reason.
>
> Those hoping for more clarity on these issues were disappointed when the $26 billion-asset company canceled a scheduled appearance at a conference Thursday afternoon.

***Colonial Reveals the Truth Regarding its TARP Application***

68.     On January 27, 2009–more than six weeks after its last statement regarding TARP approval–Colonial Bank released its 2008 fourth quarter earnings report and an accompanying

press release.  In this press release, for the first time, Colonial stated that it would not receive the $550 million from the TARP fund until it had first raised $300 million in private capital:

> As previously announced, Colonial has received preliminary approval to receive $553 million from the U.S. Treasury's Capital Purchase Program (TARP). Such participation is subject to Colonial's increasing equity by $300 million. "The Company is actively pursuing a variety of capital raising alternatives to increase equity by $300 million which would satisfy this condition of the TARP preliminary approval. The Company is currently in negotiations with several investors. One such investor group is SunTx Capital Partners of Dallas, Texas, with which the Company has signed a non-binding letter of intent with respect to a potential investment by SunTx Capital Partners and prospective co-investors of up to 24.9% of the Company's proforma capitalization with a price range per share of $1.00 to $1.50, subject to the negotiations of a definitive agreement and obtaining of necessary approvals," said Mr. Lowder.

The Press Release was an Exhibit to a Form 8-K that Colonial filed with the SEC on January 27, 2009, signed by Defendant Moore.

69.     Notably, the Company did not disclose that this was a new requirement but did disclose that negotiations were underway for a venture capital fund to inject the necessary capital through the purchase of (presumably treasury) shares with a value of $1 to $1.50, evidencing that this was a known requirement that was withheld from the investing public.

70.     Not unexpectedly, analysts and the media reacted with shock and general negativity to Colonial's earlier omission and recent disclosure. Analyst Jefferson Harralson of Keefe, Bruyette & Woods, a New York investment bank that is among the most influential analysts of regional bank stocks, summed up Colonial's deception in connection with downgrading his rating on Colonial stock: "We had believed that Colonial was awarded TARP funds in December based on typical standard conditions and are surprised that the TARP funds are contingent on a common raise."

71.     Analyst Jaime Peters wrote the following scathing report on January 28, 2009:

> Feeling deceived, we are placing Colonial BancGroup under review as we incorporate newly public information surrounding its preliminary Troubled Asset Relief Program approval. Nearly two months after the initial announcement, the company disclosed the approval was contingent on its raising $300 million of fresh equity capital. The bank has shopped the equity around and looks like it will be able to raise it, probably somewhere between $1 and $1.50 per share. Any deal

of this size at such low prices will significantly dilute current shareholders. With a Tier 1 ratio of 8.88% on Dec. 31 and continued deterioration expected in Florida, the company needs to raise the capital in order to survive this crisis and position itself for the long term, in our opinion. Add this news to a $4.11 per share fourth-quarter loss (two thirds of it from a goodwill write-down), and we expect to significantly cut our fair value estimate and Stewardship Grade.

72.     Another analyst, Philip Van Doorn of *TheStreet.com*, wrote a piece titled "Beware Banks' Unfunded Tarp Talk" on January 30, 2009, which prominently featured Colonial:

Colonial BancGroup's (CNB) recent disclosure of potentially problematic terms tied to a previously announced government investment should give investors pause about basing investment decisions on companies' statements about government bailout applications

Colonial on Dec. 2 said in a Securities and Exchange Commission Filing that the Treasury had approved an application for a $553 million preferred equity investment through the Troubled Asset Relief Program, or TARP. Shares of the $26 billion Montgomery, Ala., holding company responded by rallying 50%, closing at $3.08 that day

Investors wondering why Colonial hadn't made any further announcements likely got their answer when the company reported earnings Tuesday after the market close. In the report, Colonial mentioned that its preliminary approval to receive $553 million (a revised number) in TARP money *was contingent upon* raising an additional $300 million in capital on its own

The problem is the company never mentioned this in its Dec. 2 filing. In an environment where the public equity market was pretty much closed to banks, and the competition for private money was fierce, this might have raised concern to some investors who believed receiving the TARP money was a mere formality

Not surprisingly, shares were down 46% Wednesday, which was a great day for many other bank stocks

Colonial has expressed confidence it would complete the private capital raise and receive the TARP money in the first quarter. And while the company's failure to disclose that the TARP approval was contingent on the private capital-raising in the Dec. 2 filing might have been an oversight, some lawyers believe Colonial could be a violation of an SEC rule that bars companies from making untrue statements or omitting material facts that would keep financial statements from being misleading.

73.     Following those revelations, Colonial stock fell precipitously. On January 28, the

day Colonial issued its press release, shares fell more than 50%, closing at $0.63, compared to $1.58 on January 27. The *Birmingham Business Journal* traced the connection between Colonial's stock price and its Dec. 2 omissions and misstatements and subsequent revelation on Jan. 28:

> Colonial BancGroup is taking heat on Wall Street and in the financial press for disclosing last week that it must raise a hefty amount of money before Uncle Sam agrees to hand over bailout funds.
>
> The Montgomery-based bank divulged last week that it must raise $300 million in equity in order to participate in the U.S. Treasury Department's Troubled Asset Relief Program, a contingency the bank did not disclose explicitly when it first announced in December that it received preliminary approval for $550 million in capital.
>
> The new development in Colonial's TARP funding is raising eyebrows among some banking analysts and banking experts.
>
> "I would consider that to be a pretty significant omission," said Bert Ely of Alexandria, Va.-based financial services consulting firm Ely & Co. "It's not a slam dunk for anyone to raise $300 million in this type of environment."
>
> TARP's Capital Purchase Program, designed to pump money into U.S. banks in exchange for preferred stocks and warrants, was designed to boost investors' confidence in financial institutions.
>
> Most investors pay close attention to those banks that have–and haven't–received TARP funding. Many believe that if the government is willing to pour money into a bank, then it must be stable, said University of Alabama at Birmingham finance professor Andreas Rauterkus.
>
> The day Colonial announced its TARP funding, investors rallied around the bank's stock. Its shares spiked 54 percent to $3.08 at close, up from the previous day's close of $2.
>
> "Clearly if (Colonial) had said that it would have to raise $300 million before it could receive TARP money that would have raised a big red flag," he said.
>
> In comparison, last week when the bank announced that it needed to raise more equity, its share prices plummeted more than 50 percent. Its shares closed Wednesday at 63 cents, compared to $1.58 on Jan. 27.

74.     The facts discussed in the above article show that by stating that it had been

approved for TARP funds while omitting the $300 capital requirement in its Dec. 2 press release, Colonial Bank caused its common stock to be artificially inflated, with shares trading at a high of $3.08. As proved by later events, if Colonial had disclosed the entire truth concerning the TARP funds, its shares would have traded closer to the Jan. 28 price of $0.63.

75.     In the January 28, 2009, fourth quarter and 2008 earnings call between Colonial executives and industry analysts, Lowder admitted that the $300 million requirement was part of the original approval key for the TARP funding, and that Colonial Bank was aware of the requirement when it published its December 2, 2008 press release:

**Kevin Fitzsimmons – Sandler O'Neill**

Two questions. First, Bobby, I know you say how the TARP funds are subject to the 300 million in equity. Is there any kind of beyond that? Is there any kind of formal agreement, any prompt coercive action or C & D with the regulators, number one …

**Bobby Lowder**

Okay. I think there were a couple of questions there. First of all, Kevin, we are under no C & D and we are under no prompt coercive action. So there is no debt outstanding. We are working towards raising the capital. As we said, we have met with a number of folks since December when we've received the top conditional approval. It's going to be a difficult environment out there. It deteriorated as we have gone through the last couple of months. Market conditions have deteriorated. And due diligence requirements of potential investors have increased significantly from prior periods.

**Christopher Marinac – Fig Partners**

Thanks Bobby. If I could, can I go back to Kevin's question. So what has changed in the month of December and in January really. In the department, was there some discussion after they gave you some preliminary approval in early December?

**Bobby Lowder**

Well, we got preliminary approval, but we made it clear that our approval was subject to certain conditions and so, this was one of the conditions, only is the condition. Ours was approved on to raise these additional capitals. And so as part of our regular earnings announcement, we are just updating everyone on our various capital raising plans and to tell you all where we are right now.

**Christopher Marinac – Fig Partners**

Okay, so this was part of the original approval key back in December

**Bobby Lowder**

That's right.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

76.     At all relevant times, the market for Colonial's securities was an efficient market for the following reasons, among others:

      a.     Colonial common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and open market;

      b.     As a regulated issuer, Colonial filed periodic public reports with the SEC; and

      c.     Colonial regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits or major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

77.     As a result of the foregoing, the market for Colonial's publicly traded securities promptly digested current information regarding Colonial from all publicly available sources and reflected such information in the price of Colonial securities. Under these circumstances, all purchasers of Colonial's publicly traded securities during the Class Period suffered similar injury through their purchase of such securities at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

78.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements alleged in this Complaint, because these statements are all statements of then-present facts and were not identified as "forward-

looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary disclaimers to identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Colonial who knew that those statements were false when made.

## COUNT I:  Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### *Against All Defendants*

79.     The Plaintiff repeats and reallege each and every allegation contained above as if fully set forth herein.

80.     During the Class Period, the Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or recklessly disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

81.     The Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

82.     During the Class Period, the Defendants materially misled the investing public, thereby artificially inflating the price of Colonial's publicly traded securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make the Defendants' statements, as set forth herein, not false and misleading. Those statements and omissions were materially false and misleading, because they failed to disclose material adverse information and misrepresented the truth about the Company, as alleged herein.

26

83.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by the Plaintiff and other members of the Class, who suffered losses upon the revelation on January 27, 2009 of the $300 million capital raise requirement imposed by the Treasury.

84.    As described in this Complaint, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Colonial's agreement with the Treasury concerning the Company's receipt of TARP funds. These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Colonial and its business, prospects and operations, thus causing the Company's publicly traded securities to be overvalued at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in the Plaintiff and the other members of the Class purchasing the Company's publicly traded securities at prices that did not reflect to true financial condition of the Company and suffering losses when the price of Colonial common stock declined upon the revelations described herein, thus causing the damages to the Plaintiff and the members of the Class.

***Additional Scienter Allegations***

85.    As alleged in this Complaint, the Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents.  As set forth elsewhere herein in detail, the Defendants, by virtue of their receipt of information reflecting the true facts regarding Colonial, their control over, and/or receipt and/or modification of Colonial's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Colonial's agreement with the Treasury for TARP funding, participated in the fraudulent scheme alleged herein. The Defendants, by virtue of their positions as senior officers of the Company, and the Company itself, were aware of the $300 million condition precedent imposed on the Company's receipt of TARP funding at the time of the December 2 public statements, and therefore acted with

knowledge and deliberation in failing to disclose that material condition to the public on December 2, causing the December 2 public statements to be a materially false and misleading.

86.     The market for Colonial's publicly trade securities was open, well-developed and efficient at all relevant times. The Plaintiff and other members of the Class purchased or otherwise acquired Colonial publicly traded securities relying upon the integrity of the market price of Colonial's securities and market information relating to Colonial, and have been damaged thereby when the price of Colonial common stock declined precipitously upon the revelations described here.

87.     The Plaintiff and the members of the Class would not have purchased Colonial publicly traded securities at the prices they paid or received, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

88.     As a direct and proximate result of these Defendants' wrongful conduct, the Plaintiff and the other members of the Class have suffered damages in connection with their purchases of Colonial publicly trade securities during the Class Period.

**COUNT II:  Violation of Section 20(a) of the Exchange Act**
***Against the Individual Defendants***

89.     The Plaintiff repeats and realleges every allegation above as if fully set forth here.

90.     The Individual Defendants acted as controlling persons of Colonial within the meaning of Section 20(a) of the Exchange Act as alleged herein.

91.     Because of their positions and responsibilities as officers and/or directors of Colonial and their ownership of Colonial stock, the Individual Defendants had the power and authority to cause Colonial to engage in the wrongful conduct complained of here. Because of that conduct, the Individual Defendants are liable under Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

The Plaintiff and Class Members request that this Court grant the following relief:

A.    Determine that this action is a proper class action and certify Plaintiff as a class representative and Plaintiff's counsel as Class Counsel under Federal Rule of Civil Procedure 23;

B.    Award compensatory damages in favor of the Plaintiff and the members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of the Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Award Plaintiff and the members of the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

E.    The Plaintiff requests a jury trial on any issue so triable.

Respectfully submitted this 25 day of February, 2009.

OF COUNSEL
Joe R. Whatley Jr. (jwhatley@wdklaw.com)
Thomas J. Butler (tbutler@wdklaw.com)
Adam P. Plant (aplant@wdklaw.com)
**Whatley Drake & Kallas, LLC**
2001 Park Place North, Suite 1000
P O Box 10647
Birmingham, AL 35203
Tel:  (205) 328-9576/Fax: (205) 328-9669

Edith M. Kallas (ekallas@wdklaw.com)
Deborah Clark-Weintraub (dweintraub@wdklaw.com)
**Whatley Drake & Kallas, LLC**
1540 Broadway, 37th Floor
New York, NY  10036
Tel.: (212) 447-7070 / Fax: (212) 447-7077

Chris T. Hellums (chrish@ pdkhlaw.com)
Leigh King Forstman (leighf@pdkhlaw.com)
**Pittman, Dutton, Kirby & Hellums**
2001 Park Place North, Suite 1100
Birmingham, AL  35203
Tel:  (205) 322-8880 / Fax: (205) 328-2711

Nicholas B. Roth (nbroth@eysterkey.com)
**Eyster, Key, Tubb, Roth, Middleton & Adams, LLP**
P.O. Box 1607
Decatur, AL  35602
Tel.: (256) 353-6761/ Fax:  (256) 353-6767